## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERIC JAMES BAGNALL,<br>individually, and as Administrator of the<br>ESTATE OF CAMREN MCKAY<br>BAGNALL<br><br>        Plaintiff,<br><br>  v.<br><br>CALIFORNIA STATE UNIVERSITY<br>MARITIME,<br><br>VINEETA DHILLON,<br><br>LILLIAN GREGG,<br><br>JOHN DOES 1- 10 (fictitious names), and<br><br>ABC ENTITIES 1-10 (fictitious entities),<br><br>        Defendants. | Civil Action No.: _____<br><br><br>**COMPLAINT AND JURY DEMAND** |

COMES NOW ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, his beloved son, by and through their undersigned attorneys, Lento Law Group, P.C, bring this action against Defendants CALIFORNIA STATE UNIVERSITY MARITIME, VINEETA DHILLON, LILLIAN GREGG, JOHN DOES 1- 10 (fictitious names), and ABC ENTITIES 1-10 (fictitious entities), alleging, based upon information and belief, as follows:

## **INTRODUCTION**

1.      This tragic matter arises as the consequence of yet another false accusation of sexual misconduct and the subsequent misapplication of Title IX, Education Amendments Act of 1972,

1

20 U.S.C. §§1681 - 1688 (2018), leading to the untimely death, by suicide, of a blameless young man – Camren McKay Bagnall (hereinafter, "Camren" or the "Decedent").

2.      Plaintiff, the Decedent's bereft father, brings this action for wrongful death, emotional distress, and survival claims, in connection with the passing of his son.

3.      At the time of his tragic death, Camren was nine (9) days shy of his 20th birthday.

4.      In short, the events that ultimately lead to Camren's tragic death commenced with Defendant, LILLIAN GREGG's filing of a false Title IX complaint against the Decedent, alleging claims of sexual misconduct and sexual assault, thereafter, followed by a wrongful and woefully deficient Title IX investigation by Defendant CALIFORNIA STATE UNIVERSITY MARITIME, and finally, the unjust presumption of Decedent's guilt by Title IX Coordinator, Defendant VINEETA DHILLON, throughout the course of the investigation.

## PARTIES

5.      At all times relevant herein, Plaintiff, ERIC JAMES BAGNALL, is an adult resident of Middlesex County, Connecticut, with a residential address of 9 Frederick Place, Clinton, Connecticut 06413, and is the father of the Decedent, Camren McKay Bagnall.

6.      At all times relevant herein, Defendant CALIFORNIA STATE UNIVERSITY MARITIME ACADEMY (hereinafter "CAL MARITIME") is a California Public University located at 200 Maritime Academy Drive, Vallejo, California 94590.

7.      At all times relevant herein, Defendant, VINEETA DHILLON, is the Title IX Coordinator assigned to the investigation of Decedent by the Defendant CAL MARITIME, and said Defendant has a residential address for service of process believed to be 1695 Highland Circle, Fairfield, California 94534.

8.      At all times relevant herein, Defendant, LILLIAN GREGG, is an adult resident citizen of Washoe County, Nevada, with a residential address for service of process believed to be 2800 Enterprise Road, Apt. 1622, Reno, Nevada.

9.      Said Defendant was an undergraduate student at CAL MARITIME at the time of the events herein complained of.

10.     At all times relevant to this action, Defendants JOHN DOES 1-10 and ABC ENTITIES 1-10, are fictitious names for Defendants and entities whose identities are unknown at present, but who constitute persons, partnerships, joint ventures, corporations, associations, or other forms of public or private entities who or which participated in the tortious actions of Defendants described herein, whether by way of their negligence or in other ways as yet undetermined.

## JURISDICTION & VENUE

11.     This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     Furthermore, this court has personal jurisdiction over all parties hereto.

13.     This Court also has supplemental jurisdiction over Plaintiff's related state claims pursuant to 28 U.S.C. § 1367(a), as such claims are so related to Plaintiff's federal claims that they form part of the same case or controversy and arise out of a common nucleus of operative fact.

14.     Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(2), as, upon information and belief, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## GENERAL FACTUAL BACKGROUND

15.     Camren McKay Bagnall was the biological son of Plaintiff, Eric James Bagnall.

16.     Camren relocated to California from Connecticut to attend school at Cal Maritime, with the hope of educating himself such that he could build a bright and successful future.

17.     Tragically, such a bright and successful future for Camren would never come to pass due directly the acts and/or omissions of the Defendants named herein.

18.     On February 8, 2021, Camren's life was cut woefully short at the tender age of 19 years old.

19.     Camren's agonizing decision to end his own life came after facing false accusations, brought against him by way of a Title IX complaint waged by Defendant Lillian Gregg, to the Title IX office of Cal Maritime sometime around September 2020, and the subsequent negligent and improper handling of the investigation which followed.

20.     At the time of Defendant Gregg's filing of the subject Title IX complaint, Defendant Cal Maritime, assigned and permitted an unqualified and incompetent Title IX Coordinator to investigate the matter, corrupting what is intended to be a just and fair process into an unadulterated and inquisitorial fishing expedition.

21.     For background, the Decedent and Defendant Lillian Gregg met as freshmen at Cal Maritime.

22.     Given that learning was then taking place virtually due to the COVID-19 Pandemic, the Decedent and the Defendant Gregg met through social media as there were several mutual friends as between the two, and they had some of the same classes, and thus, saw each other during those classes.

23.     As a result of the virtual learning, they communicated predominantly via Facetime and text message.

24.     On or about August 16, 2022, Defendant Gregg asked the Decedent, via text, if he would like to watch a movie at her dorm. The Decedent agreed.

25.     That same night as Camren took a shower to get ready to go over to Defendant Gregg's dormitory, the shower accidentally flooded.

26.     The water flooded to such an extent that it was noticed by a fellow student within the dormitory named Brandon Kolarov, and as result, Kolarov and Decedent together attempted to stop the flooding around 10:33PM.

27.     The fact of Kolarov's having been present with the Decedent that night becomes and important fact given what eventually transpired later.

## EVIDENCE AND CONTRADICTIONS

28.     As stated before, sometime in September 2022, Defendant Gregg filed a Title IX complaint against the Decedent in connection with his alleged conduct on the night of August 16, 2022.

29.     The allegations against the Decedent were unsubstantiated, false, and wholly without merit.

30.     Even so, throughout the investigation, Camren felt that his guilt had been presumed the moment Defendant Gregg brought the complaint, as it appeared that, immediately, only one side of the story was being believed – Defendant Gregg's – and that anything Camren said in his defense or in contradiction of allegations made by Defendant Gregg were immediately dismissed out of hand.

31.      Statements by Camren were given to the Cal Maritime police and were also provided to Defendant Vineeta Dhillon.

32.     All statements demonstrated a consensual sexual encounter as between Camren and Defendant Gregg.

33.     Nonetheless, Defendant Gregg alleged that the Camren was drunk and high on the evening of their encounter.

34.     Throughout the investigation, importantly, Defendant Vineeta Dhillon was not able to confirm or corroborate this allegation, and in fact, the allegation was wholly disproven.

35.     Brandon Kolarov, who met with the Decedent shortly prior to the alleged incident, as a result of the two of them working together to stop the flood from the shower in the dormitory, provided statements regarding his observations of Camren during this interaction.

36.      In his statements, Kolarov consistently explained that the Decedent did not appear intoxicated, nor did he emit any odor of alcohol.

37.     Max Liss, another witness who was physically present with the Decedent until 9:00 PM on August 16, 2020, also provided a statement corroborating Kolarov's claim that the Decedent did not appear intoxicated, and he had not observed the Decedent consume any alcoholic beverages that day.

38.     Importantly, Defendant Gregg accused the Decedent of sexual misconduct and sexual assault, stating in her report that the Decedent kissed her after she told him, "I do not want to do anything [sexually]," (hereinafter, "The Initial Statement").

39.     However, Defendant Lillian Gregg later provided a contradicting statement.

40.     In a later statement, as it appeared in the Title IX Preliminary Report prepared by Defendant Dhillon, Defendant Gregg stated that she was initially an active participate in the sexual encounter between Decedent and herself.

41.     Another contradiction appears when Defendant Gregg was asked about allowing the Decedent to touch certain places on her body.

42.     Defendant Gregg stated that she gave the Decedent "physical cues," encouraging the Decedent to initiate physical sexual contact with her, which contradicts a prior statement where Defendant Gregg indicated that she, "faked it to get [the Decedent] out of her room".

43.     Regarding the sexual misconduct described in the report as "Sexual Assault Rape" and "Sexual Assault Fondling", all acts were clearly consensual as both the Cal Maritime Police Report and the Title IX Preliminary Report establish.

44.     Furthermore, Camren provided text messages from that same night, sent to him by Defendant Gregg, proving that the incident was, indeed, consensual.

45.     An additional contradiction in Defendant Gregg's story is her claim of being fearful of Camren, and specifically her claim that when she saw him in class the day after the alleged incident, she "flipped out".

46.     In fact, the day after Defendant Gregg invited the Decedent to her room, she then invited him to a trip to Target on August 17, 2020, but he could not attend.

47.     Were Defendant Gregg truly fearful of Camren as she claimed, following the alleged incident of August 16, 2020, why then would she invite him to join her on an excursion the very next day?

48.     During the trip, per the statement provided by Max Liss, Defendant Gregg even asked about Camren and the reason he could not join them on the trip, and further, asked specifically if Camren had a girlfriend – inquiries she surely would not make if she were truly fearful of Camren as she claimed.

49.     Additionally, it was clear from the Title IX Preliminary Report and the Cal Maritime Police Report, that Defendant Gregg, after speaking to an individual named Madison "Maddy" Dack at

the school, about the alleged incident, was shocked upon the revelation that Ms. Dack was a mandatory reporter.

50.     Defendant Gregg, who knew at the time that her allegations against Camren were fabricated, had no choice but to double down on her claims as she then had no choice but to continue the process, knowing that Ms. Dack was obligated to report even if Gregg herself declined to do so.

51.     Dack herself acknowledged Defendant Gregg's own discomfort at learning that Dack was a mandatory reporter, writing in her handwritten statement to police on August 19, 2020, that, "I informed Gregg that I am a mandated reporter and would have to report the incident. Lillian's eyes got really big after I stated this. She was already nervous-looking and responded, 'shit, okay.'"

52.     Interestingly, during her conversation with Ms. Dack, Defendant Gregg, did not mention that Camren was drunk or high, and thus, it is clear that in light of learning that Dack was obligated to report Gregg's claims to Title IX Coordinator Dhillon, Gregg began the process of bolstering her fictitious account of what occurred by adding new fabrications of "fact" every subsequent time she told the story, such as, later, including the previously omitted allegation that Camren was impaired.

53.     Put simply, Defendant Gregg, in speaking with Ms. Dack, passed the point of no return, and in doing so, she realized she had no choice but to spin a false and outrageous tale to keep her lie going, never mind the harm it could cause to Camren.

54.     A more in-depth analysis and refutation of Defendant Gregg's false allegations against the Decedent is contained in his February 5, 2021, response to the Preliminary Title IX report, a copy of which was sent to Defendant Dhillon, and which is annexed hereto as **EXHIBIT "A"** and incorporated by reference herein.

## BULLYING AND HARASSMANT WITHIN CAL MARITIME

55.     As a direct and proximate result of Defendant Gregg's filing of the false and salacious Title IX complaint against Camren, he very quickly became a victim of severe and pervasive bullying and harassment.

56.     This fact was known to Defendant Vineeta Dhillon.

57.     Camren's classmates humiliated him and besmirched his good name and character by nicknaming him "The First Floor Rapist", and repeatedly stating that he should be behind bars.

58.     Another statement was provided by Anthony Dick

59.     Anthony's statement to Defendant Dhillon elaborated upon further instances of bullying and harassment that Camren had come to face from his peers.

60.     Sometime in mid-October 2020, while Camren and Anthony were at the Campus Dining Center, a group of several student-cadets remarked about Camren, "You should be behind bars".

61.     In another similar incident, while the two were in a line for food, and after waiting for almost an hour, Camren decided to leave.

62.     Upon Camren's departure, Anthony heard a nearby student exclaim, "Thank God, the rapist has left!"

## DEFENDANT VINEETA DHILLON'S ANTI-MALE BIAS

63.     Camren provided Defendant Vineeta Dhillon with overwhelming proof of his innocence, statements of good moral character, statements from witnesses that were with him throughout the day of the alleged incident and/or shortly prior to the alleged incident, and evidence of Defendant's untruthfulness.

64.     Importantly, the Decedent was questioned by Cal Maritime Police and the report cleared his name, failing to substantiate Defendant Gregg's egregious claims.

65.     Finally, Camren believed that the horror was over, yet almost a month and a half later, he received email correspondence from Defendant Dhillon.

66.     Defendant Dhillon prejudged the Decedent on the basis of his sex, presumed his guilt from the onset of her investigation, and examined the exculpatory evidence presented to her through a tainted lens designed only to reinforce her preconceived notion that he had, in fact, done as Defendant Gregg alleged.

67.     Immediately buying into Defendant Gregg's false allegations, Defendant Dhillon provided Camren with an unfair and unjust Title IX process, essentially flipping the burden of proof such that he was not innocent until proven guilty, but rather, guilty until proven otherwise.

68.     Evidence of Defendant Dhillon's anti-male bias is evidenced by her social media posts which **<u>overwhelmingly</u>** advertise Dhillon's radical feminism.  *See*, but only twenty (20) page's worth of Defendant Dhillon's pro-women LinkedIn posts, which she liked, shared, or posted herself within the last year alone, annexed hereto as **EXHIBIT "B"**.

69.     Defendant Cal Maritime, in light of Defendant Dhillon's social media posts, should have known that she was clearly not impartial when it came to sex-based issues such as allegations of sexual abuse or misconduct perpetrated by a male student, and thus, was not fit for the job of Title IX Coordinator.

70.     So it was that when Defendant Gregg's fictitious complaint against Camren came to Defendant Dhillon's attention, Dhillon – blinded by her extreme pro-women and anti-male prejudice – took hold of the investigation like a dog with a bone and would not cease until Camren was punished – his blatant innocence be damned.

71.     As a result, Defendants Cal Maritime, Vineeta Dhillon, and Lillian Gregg, by their actions and/or omissions, contributed, individually and collectively, to the tragic outcome –  the death by

hanging – of Camren McKay Bagnall, that occurred but only 139 days after the initial communication from Title IX Coordinator, Defendant Vineeta Dhillon and the commencement of her vile inquisition against a blameless young man who simply happened to be the subject of a fabricated witch-hunt contrived by Defendant Gregg.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(Against Defendant Lillian Gregg)**

72.     Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

73.     Defendant Lillian Gregg had a duty, whether arising under statute, regulation, or common law, to refrain from filing a Title IX complaint that contained false or misleading representations of fact when she knew that said representations of fact made by her were, in fact, false.

74.     Despite this duty, Defendant Gregg proceeded to do just that, by filing the subject Title IX complaint with Defendant Cal Maritime's Title IX Coordinator, Defendant Vineeta Dhillon, despite knowing all the while that said Title IX complaint was rife with falsities and fabrications.

75.     But-for Defendant Gregg's filing of her false Title IX complaint against the Decedent, the Decedent would not have been subjected to an inquisitorial Title IX investigation helmed by Defendant Dhillon, nor would he have been subjected to relentless and unwarranted harassment and bullying by fellow students on campus.

76.     It is reasonably foreseeable that when an individually, particularly a woman such as Defendant Gregg, files a false Title IX complaint against another individually, particularly a man such as the Decedent, she is opening him up to the full gambit of adverse consequences that could serve to completely destroy his personal and professional life.

77.     Thus, as a direct and proximate result of Defendant Gregg's knowing and intentional filing of a false Title IX complaint against the Decedent she caused Decedent to suffer through immense ridicule, the destruction of his reputation, and relentless bullying and harassment, which ultimately forced Decedent into taking his own life as his only means of escaping the cruel and unmerited assault on his character.

**WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against Defendant LILLIAN GREGG, for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, including punitive damages, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

**COUNT II**
**NEGLIGENCE**
**(Against Defendant Vineeta Dhillon)**

78.     Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

79.     Defendant Vineeta Dhillon had a duty, whether arising under statute, regulation, or common law, to comport her attitude, outlook, and behavior in a manner commensurate with the role of a Title IX Coordinator, and to fairly and impartially execute the duties inherent in such a role, regardless of the sex of the Complainant and Respondent before her in a given matter.

80.     Despite this duty, Defendant Dhillon failed to fairly and impartially execute the duties of her office, and instead injected her own personal pro-women bias into the subject Title IX investigation against the Decedent, dismissing out of hand exculpatory evidence, and failing to

administer an unbiased Title IX investigation commensurate with the foundational maxim that the Decedent, as Respondent, was innocent until proven guilty.

81.     But-for the failure of Defendant Dhillon to separate out her own personal anti-male biases and thereby provide the Decedent with a fair and impartial Title IX investigation, Decedent would have received the fair and impartial process to which he was entitled, and said fair and impartial process would certainly have cleared him of any alleged wrongdoing.

82.     It is reasonably foreseeable that a Title IX Coordinator with an anti-male bias, such as Defendant Dhillon, might deny a male respondent such as the Decedent, a fair and unbiased Title IX investigatory process, and in so doing, unjustly prejudice the respondent and sway the course and outcome of such an investigation.

83.     Thus, as a direct and proximate result of Defendant Dhillon anti-male prejudice and how said prejudice came to bear upon her duties as the Title IX Coordinator administering the investigation into the subject Title IX complaint against the Decedent, Defendant Dhillon negligently and/or recklessly failed to administer a fair and unbiased process to the Decedent, ultimately causing him to suffer relentless harassment and bullying from his fellow students, as well as irreparable reputational harm, which ultimately culminated in Decedent being forced into taking his own life as his only means of escaping the cruel and unmerited assault on his character.

        **WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against Defendant VINEETA DHILLON, for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, including punitive damages, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

## COUNT III
## NEGLIGENT HIRING, TRAINING, SUPERVISION, OR RETENTION
### (Against Defendant Cal Maritime)

84.     Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

85.     The Decedent was harmed by Defendant Vineeta Dhillon, an employee of Defendant Cal Maritime, who was negligent in its hiring, training, supervision, and/or retention of her in the position of Title IX Coordinator.

86.     As a direct and proximate result, Defendant Cal Maritime is responsible for the harm caused to the Decedent, and by extension, to Plaintiff.

87.     Specifically, Defendant Dhillon was, at the time of hire, or subsequently became, unfit for to perform the work for which she was hired at Cal Maritime.

88.     The specific reasons for this unfitness have been articulated more fully in the section of the herein complaint titled, "Defendant Vineeta Dhillon's Anti-Male Bias," and Plaintiff expressly incorporates the allegations contained therein here, as though set forth at length.

89.     Defendant Cal Maritime knew or should have known that Defendant Dhillon, as its employee, was or became unfit, and that this unfitness created a particular risk to Defendant Cal Maritime's students – particularly its male students.

90.     Adequate background screening – for example, a cursory glance at Dhillon's social media accounts – as well as adequate supervision, would have given Defendant Cal Maritime advanced notice of Defendant Dhillon's unfitness.

91.     Defendant Cal Maritime had a duty to train and/or supervise Defendant Dhillon, such that she did not pose a particular risk to the students whose Title IX investigations she oversaw or administered.

92.     Alternatively, and in the absence of sufficient training and/or supervision, Defendant Cal Maritime had a duty to promptly terminate Defendant Dhillon upon learning of her unfitness, such that should could not continue to pose a particular risk to students.

93.     Despite these duties, Defendant Cal Maritime failed to adequately screen Defendant Dhillon prior to her hiring, for had they done so, Defendant Cal Maritime would have learned of Dhillon's anti-male bias.

94.     Alternatively, Defendant Cal Maritime failed to adequately and properly train Defendant Dhillon, for had they done so, they would have educated her as to her implicit or explicit bias against male students, and further, educated her as to how to administer Title IX procedures justly and impartially.

95.      Alternatively, Defendant Cal Maritime failed to adequately and properly supervise Defendant Dhillon, for had they done so, they quickly would have discovered her anti-male bias and the manner in which said bias made itself manifest vis-à-vis Dhillon's conduct – in other words, her slanted predisposition to believe female students over male students in the performance of her Title IX duties.

96.     Alternatively, Defendant Cal Maritime failed to timely terminate Defendant Dhillon after learning of her unfitness for the role of Title IX Coordinator, given her anti-male bias.

97.     Through the unfitness of Defendant Dhillon to fairly and impartially perform the work for which she was hired, without posing a particular risk to Defendant Cal Maritime's male students, the Decedent – one such male student who was unfortunate enough to be the target of Dhillon's anti-male bias – was irrevocably harmed.

98.     Ultimately, as a direct and proximate consequence of the negligent hiring, training, supervising, and/or retaining of Defendant Dhillon by Defendant Cal Maritime, Decedent was

caused to suffer relentless harassment and bullying from his fellow students, as well as irreparable reputational harm, which culminated in Decedent being forced into taking his own life as his only means of escaping the cruel and unmerited assault on his character.

   **WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against Defendant CAL MARITIME, for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, including punitive damages, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

**COUNT IV**
**NEGLIGENCE VIA VICARIOUS LIABILITY**
**TORT LIABILITY ASSERTED AGAINST PRINCIPAL**
**(Against Defendant Cal Maritime)**

99.    Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

100.    Defendant Cal Maritime had a duty, whether arising under statute, regulation, or common law, to exercise due care with respect to the safe and responsible conduct of its business – as relevant here, the operation and administration of its Title IX safeguards – such that every Title IX respondent subjected to the school's Title IX process be the recipient of a fair and impartial investigatory and adjudicative process.

101.    Defendant Cal Maritime breached this duty, however, as it relates to the Decedent, as the Decedent did not receive a fair and impartial Title IX process, given that said process was helmed and guided by Defendant Vineeta Dhillon, whose inherent anti-male bias prejudiced Decedent from the moment the investigation began.

102.    Defendant Dhillon's failures, as well as evidence of her predisposition to blindly believe female Title IX complainants at the expense of male respondents, has been articulated more fully

in the section of the herein complaint titled, "Defendant Vineeta Dhillon's Anti-Male Bias," and Plaintiff expressly incorporates the allegations contained therein here, as though set forth at length.

103.    As a direct and proximate result of Defendant Dhillon's negligent or otherwise tortious conduct in her role of Title IX Coordinator, the Decedent was severely harmed.

104.    At the time Defendant Dhillon harmed the Decedent in this manner, Dhillon was engaged in an employee-employer relationship with Defendant Cal Maritime.

105.    Further, at the time Defendant Dhillon harmed the Decedent, Dhillon was acting within the scope of her employment with Defendant Cal Maritime, and for the benefit thereof.

106.    Vicarious liability is deemed inappropriate where the misconduct does not arise from the conduct of the employer's enterprise. *See*, _Farmers Ins. Group v. County of Santa Clara_, 11 Cal.4th 992, 1006 (1995).

107.    Conversely then, where the misconduct *does* arise from the conduct of the employer's enterprise, vicarious liability is deemed appropriate.

108.    Thus, given that there is a direct causal nexus between Defendant Dhillon's work as Title IX Coordinator within Defendant Cal Maritime's enterprise (the school), and her negligent or otherwise tortious conduct, as evidenced by the fact that it was through her very function as Title IX Coordinator that Dhillon came to harm the Decedent, vicarious liability is, indeed, appropriate.

109.    Defendant Cal Maritime, as Defendant Dhillon's employer, therefore is, and must so be held, vicariously liable for the harm Defendant Dhillon caused to the Decedent.

**WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against Defendant CAL MARITIME, for such sums as would reasonably and properly compensate Plaintiff in accordance

with the laws of the State of California, including punitive damages, together with interest and

court costs, along with such other and further relief as the Court may deem equitable and just.

**COUNT V**
**DEFAMATION *PER SE***
**(Against Defendant Lillian Gregg)**

110.    Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint

thus far above, as if fully stated herein.

111.    Cal. Civ. Code § 45a provides, in relevant part, that, "A libel which is defamatory of the

plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other

extrinsic fact, is said to be a libel on its face."

112.    False statements charging the commission of crime, or tending directly to injure an

individual with respect to his or her profession by imputing dishonesty or questionable conduct

are defamatory *per se*. *See*, *Weinberg v. Feisel,* 110 Cal.App.4th 1122, 1127 (2003), *see also*,

*Barnes–Hind, Inc. v. Superior Court,* 181 Cal.App.3d 377, 385 (1986).

113.    In her Title IX complaint against the Decedent, Defendant Lillian Gregg falsely accused

the Decedent of conduct amount to the crime of sexual battery (assault) under California law.

114.    Specifically, Cal. Penal Code § 243.4(e)(1) provides, in relevant part, that:

> Any person who touches an intimate part of another person, if the
> touching is against the will of the person touched, and is for the
> specific purpose of sexual arousal, sexual gratification, or sexual
> abuse, is guilty of misdemeanor sexual battery...

115.    Despite Defendant Gregg's knowledge of the untruthfulness of her allegations against the

Decedent, Defendant Gregg nonetheless made publication of said false allegation to Defendant

Dhillon with malice or ill will towards the Decedent.

116.    To the extent that Defendant Gregg's false and defamatory statements about the Decedent

may have been privileged under Cal. Civ. Code § 47 as an official proceeding under Title IX – and

Plaintiff does not concede that they were – "the privilege is lost if the publication is motivated by hatred or ill will toward plaintiff, or by any cause other than the desire to protect the interest for the protection of which the privilege is given." *Brewer v. Second Baptist Church*, 32 Cal.2d 791, 797 (1948).

117.   Clearly then, given that Defendant Gregg knew her statements about the Decedent were false, her publication of said statements to Defendant Dhillon were malicious and made with the intent to harm Decedent, and thus, any such privilege which may otherwise have existed, was abdicated by Defendant Gregg's ill will and improper purpose.

118.   Finally, the false and defamatory statements made and/or published to Defendant Dhillon by Defendant Gregg were of the type which have a natural tendency to injure or cause special damage; this is especially so given that said statements were false allegations of Decedent's commission of a crime.

119.   Therefore, Defendant Gregg has defamed Decedent as a matter of law, and thus, damage to the Decedent's reputation 'is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages' including, in an appropriate case, punitive damages." *Barnes–Hind, Inc., supra.* 181 Cal.App.3d 337 at 356, *citing, Contento v. Mitchell*, 28 Cal.App.3d 356, 358 (1972).

**WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against Defendant LILLIAN GREGG, for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, including punitive damages, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendant Lillian Gregg)

120.    Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

121.    Defendant Lillian Gregg intentionally inflicted emotional distress upon the Decedent.

122.    Specifically, by intentionally and maliciously filing a false and defamatory Title IX complaint against the Decedent, wrongfully alleging that the Decedent had perpetrated acts of sexual assault, abuse, or misconduct, upon her, Defendant Gregg engaged in outrageous conduct so extreme as to exceed all bounds of that usually tolerated in a civilized society.

123.    Given Defendant Gregg's knowledge of the untruthfulness of the allegations she levied against the Decedent within her Title IX complaint against him, it is clear that she acted with the intention of causing – or at the very least – with reckless disregard of the probability of causing emotional distress to the Decedent.

124.    As a direct and proximate result of Defendant Gregg's conduct in so falsely accusing him of sexual assault, abuse, or misconduct, the Decedent suffered severe or extreme emotional distress to such an unbridled extent that Defendant felt forced into taking his own life as his only means of escaping the cruel and unmerited assault on his character perpetrated by Defendant Gregg.

**WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against Defendant LILLIAN GREGG, for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, including punitive damages, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

## COUNT VII
## WRONGFUL DEATH
### (Against All Defendants)

125.     Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

126.     As stated previously, at all times relevant herein, Defendant Lillian Gregg had a duty, whether arising under statute, regulation, or common law, to refrain from filing a Title IX complaint that contained false or misleading representations of fact when she knew that said representations of fact made by her were, in fact, false.

127.     For the reasons previously articulated herein, specifically in Count I, which Plaintiff explicitly incorporates by reference here as if set forth at length, Defendant Gregg breached this duty as owed to the Decedent.

128.     As stated previously, at all times relevant herein, Defendant Vineeta Dhillon had a duty, whether arising under statute, regulation, or common law, to comport her attitude, outlook, and behavior in a manner commensurate with the role of a Title IX Coordinator, and to fairly and impartially execute the duties inherent in such a role, regardless of the sex of the Complainant and Respondent before her in a given matter.

129.     For the reasons previously articulated herein, specifically in Count II, which Plaintiff explicitly incorporates by reference here as if set forth at length, Defendant Dhillon breached this duty as owed to the Decedent.

130.     As stated previously, at all times relevant herein, Defendant Cal Maritime owed its students, including as relevant herein, the Decedent, a duty of care, whether arising by statute, regulation, or common law, in the proper hiring, training, supervision and retaining of all of its staff, especially, as relevant herein, Title IX Coordinators such as Defendant Dhillon.

131.    For the reasons previously articulated herein, specifically in Count III, which Plaintiff explicitly incorporates by reference here as if set forth at length, Defendant Cal Maritime breached these duties as owed to the Decedent.

132.    As a direct and proximate result of the respective actions and/or inactions of the Defendants, or by way of their negligent, reckless, or otherwise tortious conduct, each Defendant, individually and collectively, caused the wrongful and premature death of Plaintiff's Decedent.

133.    As a direct and proximate result of all Defendants' actions and/or inactions in this manner, Plaintiff has, and will continue to, sustain damages resulting from the loss of his son, including but not limited to, his love, comfort, affection, companionship, society, care, solace, services, and future support.

134.    Plaintiff alleges that he sustained general damages in an amount to be proven at trial.

135.    Similarly, as a direct and proximate result of all Defendants' actions and/or inactions, Plaintiff sustained special damages, as a result of being deprived his Decedent's financial support, in an amount to be proven at trial.

136.    Finally, as a direct and proximate result of all Defendants' actions and/or inactions, Plaintiff suffered, and will continue to suffer, severe and extreme emotional distress damages, resulting from the loss of his son, and for which he has required extensive medical, emotional, and/or psychological treatment, including pharmacological intervention and treatment.

**WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against all Defendants for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

## COUNT VIII
## SURVIVAL ACTION
## Pursuant to California Code of Civil Procedure § 377.30
**(Against All Defendants)**

137.    Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

138.    All Defendants, by their actions and/or inactions, negligence, recklessness, and/or breach of duty of care, are the direct and proximate cause and/or significantly contributed to the wrongful and premature death of Plaintiff's Decedent as articulated more fully previously herein.

139.    As a direct and proximate result of Defendants' actions, inactions, negligence, recklessness and/or breach of duty of care, individually, and/or collectively, these Defendants contributed to the pain and suffering of the Decedent, as well as special damages, damage to property, loss of earnings/earning capacity, and other financial losses, all in an amount to be proven at trial.

**WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against all Defendants for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, including punitive damages, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

## COUNT IX
## NEGLIGENCE *PER SE*
## Violations of California Education Code § 66270
**(Against Defendants Cal Maritime & Vineeta Dhillon)**

140.    Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

141.    The California Education Code applies to all educational entities receiving funds from the State of California.

142.  Upon information and belief, Defendant Cal Maritime is a public university, receiving funding from the State of California.

143.  Cal. Educ. Code § 66270 provides, in relevant part, the following:

> No person shall be subjected to discrimination on the basis of... gender... in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid.

144.  As stated previously, Defendant Cal Maritime assigned and/or hired Defendant Vineeta Dhillon as a Title IX Coordinator, despite Cal Maritime's knowledge, whether actual or constructive, of Defendant Dhillon's inherent anti-male bias.

145.  While it should not have, the Decedent's gender played a significant role in the Title IX investigation against him, despite the contradictions in Defendant Lillian Gregg's statements, and despite the wealth of exculpatory evidence provided to Defendant Dhillon.

146.  As a result of this gender-based discrimination which the Decedent was subjected to throughout the Title IX process, and as perpetrated by Defendant Dhillon, the Decedent felt that his side of the story was neither being heard nor considered, and that his guilt was prejudged by Dhillon based solely on the fact that he was male.

147.  Defendant Dhillon knew, and as her employer, Defendant Cal Maritime should have known as well, of the bullying and harassment, that the Decedent faced throughout the Title IX process, yet neither Defendant attempted to stop it.

148.  By its plain language, it is clear that Cal. Educ. Code § 66270 was enacted to prohibit precisely the type of gender-based discrimination to which the Decedent was subjected.

149.  Further, the Decedent, as a student in a postsecondary education institute within the State of California which receives financial assistance from the State, is precisely within the class of individuals whom Cal. Educ. Code § 66270 is intended to protect.

150.     Therefore, given the gender-based discrimination which Defendant Dhillon, and by extension, Defendant Cal Maritime, perpetrated upon the Decedent, said conduct of these Defendants was negligent *per se* in violation of Cal. Educ. Code § 66270.

WHEREFORE, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against Defendants CAL MARITIME and VINEETA DHILLON for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, including punitive damages, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

### COUNT X
### TITLE IX VIOLATIONS
**(Against Defendants Cal Maritime & Vineeta Dhillon)**

151.     Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

152.     Title IX of the Education Amendments Act of 1972 states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

153.     As stated previously, Defendant Cal Maritime assigned and/or hired Defendant Vineeta Dhillon as a Title IX Coordinator, despite Cal Maritime's knowledge, whether actual or constructive, of Defendant Dhillon's inherent anti-male bias.

154.     While it should not have, the Decedent's sex played a significant role in the Title IX investigation against him, despite the contradictions in Defendant Lillian Gregg's statements, and despite the wealth of exculpatory evidence provided to Defendant Dhillon.

155.     As a result of this sex-based discrimination which the Decedent was subjected to throughout the Title IX process, and as perpetrated by Defendant Dhillon, the Decedent felt that his side of the story was neither being heard nor considered, and that his guilt was prejudged by Dhillon based solely on the fact that he was male.

156.     Defendant Dhillon knew, and as her employer, Defendant Cal Maritime should have known as well, of the bullying and harassment, that the Decedent faced throughout the Title IX process, yet neither Defendant attempted to stop it.

157.     By its plain language, it is clear that the sex-based discrimination to which the Decedent was subjected is among the types of sex-based discrimination which Title IX was enacted to prevent.

158.     Further, the Decedent, as a person within an educational program which received Federal financial assistance, was precisely within the class of individuals whom Title IX is intended to protect.

159.     Therefore, given the sex-based discrimination which Defendant Dhillon, and by extension, Defendant Cal Maritime, perpetrated upon the Decedent, said conduct of these Defendants was negligent *per se* in violation of Title IX of the Education Amendments Act of 1972.

**WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against Defendants CAL MARITIME and VINEETA DHILLON for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, including punitive damages, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

## COUNT XI
## <u>TORTIOUS CONDUCT OF DEFENDANTS JOHN DOES 1-10 & ABC ENTITIES 1-10</u>

160.    Plaintiff realleges and incorporates by references all paragraphs contained in the Complaint thus far above, as if fully stated herein.

161.    At all times relevant to this action, Defendants JOHN DOES 1-10 and ABC ENTITIES 1-10, are fictitious names for individuals and entities whose identities are unknown at present, but who constitute persons, actors, agencies, departments, partnerships, joint ventures, corporations, associations, or other forms of public or private entities, who participated in the tortious actions of Defendants described herein, whether by way of their negligence or in other ways as of yet undetermined.

162.    As a direct and proximate results of the negligence and/or tortious conduct of Defendants JOHN DOES 1-10 and ABC ENTITIES 1-10, Plaintiff and/or Plaintiff's Decedent, have been caused to suffer, and in fact did suffer, significant damages.

163.    Plaintiff alleges an insufficient opportunity to determine the identity of all individuals or entities whose actions or omissions may be potentially responsible in whole or in part for the damages incurred by Plaintiff and/or Plaintiff's Decedent.

164.    As such, Plaintiff specifically reserves the right to name additional individuals or entities as Defendants to this action, when and if their identities become known to Plaintiff.

**WHEREFORE**, Plaintiff, ERIC JAMES BAGNALL, individually, and as Administrator of the ESTATE of CAMREN MACKAY BAGNALL, demands judgment against Defendants JOHN DOES 1-10 and ABC ENTITIES 1-10 for such sums as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of California, including punitive damages, together with interest and court costs, along with such other and further relief as the Court may deem equitable and just.

DATED: <u>February 8, 2023</u>     Respectfully submitted,


By  <u>/s/ Ryan A. O'Neill</u>
Ryan O'Neill, Esq. (ct28345)
**LAW OFFICES OF MARK SHERMAN, LLC**
29 Fifth Street
Stamford, CT 06905
Tel: (203) 358-4700
Fax: (203) 325-9478
ryan@markshermanlaw.com



LENTO LAW GROUP, P.C.

DATED: <u>February 8, 2023</u>

Joseph Cannizzo Jr., Esquire
AL State Bar No. 3584O57X
(Admission *Pro Hac Vice* to be applied for)
LENTO LAW GROUP, P.C.
Chase Corporate Center
1 Chase Corporate Center, Suite 400
Birmingham, AL, 35244
T: (385) 485-0600 | F: (313) 992-1122
jcannizzo@lentolawgroup.com
*Attorney for Plaintiff*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury in all issues, pursuant to Rule 38(b) of  The

Federal Rules of Civil Procedure.


DATED: <u>February 8, 2023</u>                     Respectfully submitted,


By <u>    /s/ Ryan A. O'Neill                </u>
Ryan O'Neill, Esq. (ct28345)
**LAW OFFICES OF MARK SHERMAN, LLC**
29 Fifth Street
Stamford, CT 06905
Tel: (203) 358-4700
Fax: (203) 325-9478
ryan@markshermanlaw.com



LENTO LAW GROUP, P.C.

DATED: <u>February 8, 2023</u>
Joseph Cannizzo Jr., Esquire
AL State Bar No. 3584O57X
(Admission *Pro Hac Vice* to be applied for)
LENTO LAW GROUP, P.C.
Chase Corporate Center
1 Chase Corporate Center, Suite 400
Birmingham, AL, 35244
T: (385) 485-0600 | F: (313) 992-1122
jcannizzo@lentolawgroup.com
*Attorney for Plaintiff*