# *EXHIBIT "A"*

February 5, 2021

**VIA EMAIL: VDhillon@csum.edu**
Vineeta Dhillon
Title IX Coordinator
200 Maritime Academy Drive
Vallejo, CA 94590

Re:   Camren Bagnall – Response To Preliminary Report And Evidence

Dear Ms. Dhillon,

Please accept this letter as a response to the Title IX preliminary investigation report and the evidence supplied. Additionally, this letter represents a request for dismissal of charges (preferably without the need for a hearing) due to the lack of sufficient evidence to support these heinous allegations. Lillian Gregg (hereinafter, "Reporting Party/Gregg") alleges that Camren Bagnall (hereinafter, "Respondent /Camren") engaged in non-consensual sexual contact with her on the night of August 16, 2020.

As an initial matter, Camren would like to note that he takes these charges very seriously and has experienced an incredible amount of stress and angst since the initial complaint was made. Furthermore, Camren has been a victim of bullying by students of Maritime California, belittling him and labeling him the "first floor rapist." This bullying stems from false allegations made by the Reporting Party. This letter is aimed to address the inconsistencies and the motivation of the Reporting Party. Specifically, this alleged incident rises and falls with credibility determination. It is crucial to note that these allegations must have a foundation to support them. Simply because a woman alleges these heinous acts against a male, it does not simultaneously carry weight with it. It is the Reporting Party who must meet her burden, truthfully.

### I.   The "Preponderance of the Evidence" Standard

During any potential upcoming hearing, Camren is subject to the "preponderance of the evidence standard," which means that—in order to sustain the charges—the evidence against Camren must have more convincing force than that opposed to it. If the evidence is so evenly balanced that a determiner of fact is unable to say that the evidence on either side of an issue preponderates, the determiner of fact must find against the party who had the burden of proving it. Here, the party with the burden of proving the fact is, for the purposes of this standard, Lillian Gregg.

### II.   Statement of Disputed and Undisputed Facts

The overall narrative provided by both sides are similar with some disputed facts that call the Reporting Party's veracity into question. For efficiency, the proceeding paragraphs will

summarize the narrative and highlight the disputed facts. After review, it will be evident that the allegations are insubstantial, meritless, and embellished. The parties' interviews and statements in the police report and the preliminary investigation report demonstrates a consensual sexual encounter. No one was forced, coerced, or was forced to act against their will during the course of their sexual interaction.

The parties met as freshmen at California State University Maritime Academy. Due to COVID-19, the orientation provided a virtual program where the students participated. The parties met through social media sites Instagram/Snapchat and had a few mutual friends. They had communicated via Facetime and saw each other during classes. The parties texted each other in a friendly matter and ultimately set up a time to hang out and watch a movie in the Reporting Party's room. On August 16, 2021 around 6:05 PM, the Reporting Party had asked Camren "Do you want to watch a movie later tonight?" (See Exhibit 3, Complainant Texts, p. 3). On the same night, around 10:33 PM the Respondent answers, "Just a sec, my rho is still awake." Id. This affirms the invitation by Reporting Party and the acceptance of the invitation by Respondent. Around this time, Camren had finished taking a shower and an accidental flood occurred. This is confirmed by Brandon Kolarov. (See Preliminary Investigation Report, p. 16). The following are the disputed facts between the Reporting Party and the Respondent's narratives provided in the Title IX preliminary investigative report:

a. **Disputed Facts:**

1. **Reporting Party alleges that Respondent was drunk and high. (See Police Report, p. 4,  2). (See Investigation Report, p. 6,  7).**
    a. This is denied. The allegation is wholly meritless. The Reporting Party is intentionally attempting to deceive the investigators into believing the Respondent was drunk or high without any proof of this.
    b. Brandon Kolarov is an eyewitness who personally observed Respondent minutes before going to the Reporting Party's room. He a non-bias 3rd party to this matter and has consistently stated that Respondent did not appear intoxicated and did not emit an odor of alcohol. (See Investigation Report, p. 16,  8).
    c. Max Liss, a witness who was physically with Respondent until 9:00 pm on the night of the incident consistently stated neither he nor Respondent drank alcohol that day. (See Investigation Report, p. 15,  6).
    d. A JUUL is a nicotine/tobacco product, not marijuana. Thus, the Respondent was not high as the Reporting Party falsely accuses.
2. **The Reporting Party alleges that Respondent kissed her without consent then allegedly asked her, "do you want to do this?" and the Reporting Party replied "sure". (See Investigation Report, p. 5,  7).**
    a. The Responding Party denies he kissed her without her consent. Irrespective of this, Reporting Party conveniently omits the fact that she laid her legs on top of Camren while touching his upper leg and penis over his clothes prior to the kissing.
    b. Even assuming the Reporting Party's statement as truthful, she clearly acknowledged and affirmed consent by stating "sure".

   c. The Reporting Party states "I was active initially..." referring to the initial kissing. (See Investigation Report, p. 6,   1). Again, this contradicts the Reporting Party's claim of being kissed without consent.
   d. Reporting Party continued to kiss Respondent consensually and did not state stop, get off me, or do anything to indicate to him that she was not consenting to their intimacy.
3. **Reporting Party alleges the Respondent touched her vagina, performed oral sex on her, and forced her to perform oral sex on him without consent.**
   a. The Respondent denies this.
   b. The Reporting party alleges Respondent attempted to have sexual intercourse, but this is patently false and denied.
   c. When asked, "Did you tell him he could or should not touch you in those places?" the Reporting Party states, I did not say anything. I was giving him physical cues." (See Investigation Report, p. 6,   7).
      i. This is contradicted by the Reporting Party's own statement yet again with her description of "faking it" or Vineeta Dhillon's input of "fawning". This is a complete contradiction of giving "physical cues" to tell someone to stop.
      ii. "I faked it to get him out of my room." (See Investigation Report, p. 7,   4).
      iii. The Respondent would ask if "it felt good," when he checked in with Reporting Party and she would reply "yeah".
         1. When the Reporting Party would tell Camren she was too sensitive, he stopped. These "cues" are contradictory to telling someone to stop.
      iv. The Reporting Party states that Respondent "asked me to give him head." (See Investigation Report, p. 6,   6).
      v. The Reporting Party verbally agrees to giving Camren oral sex in both statements. (See Investigation Report, p. 6,   9). (See Police Report, p. 4,   7).
   d. The Reporting Party was asked by Vineeta Dhillon "whether she attempted to stop the Respondent or get him to leave." (See Investigation Report, p. 7, 6).
      i. **It is a non-responsive answer. The Reporting Party does not state anything that indicates she told Camren to stop or to leave.**
4. **The Reporting Party alleges it was Respondent who began to "grind".**
   a. This is denied by the Respondent.
   b. Once the Reporting Party told Respondent she was a virgin, it was Lillian Gregg who initiated sexual touching by grabbing Camren's penis and rubbed it on her vagina.
   c. The Reporting Party was the one who initiated, "grinding," while the Respondent found it odd. He allowed the Reporting Party to get on top of him while he laid down in bed.
5. **Complainant also alleges that Respondent forced the Complainant by "pulling" on her hair and pushing her face on to his penis, to perform**

      **oral sex on the Respondent and the oral penetration was without the Affirmative Consent of the Compliamant.**
   a. The Respondent denies forcefully grabbing the Reporting Party by the hair.
   b. The Respondent denies pushing Reporting Party's face to his penis.
   c. The Respondent received oral and affirmative consent from the Reporting Party to engage in oral penetration. (See Investigation Report, p. 6,  9). (See Police Report, p. 4,  7).
6. **Reporting Party alleges she was fearful of Respondent.**
   a. Respondent was invited over by the Reporting Party after several attempts. (See Complainant's Texts, Exhibit 3).
   b. Reporting Party deliberately omits her conversation with Camren regarding their past relationships with old partners. Camren said he was not that type of guy and Reporting Party agreed, "you don't seem like that kind of person".
   c. Reporting Party texted the Respondent after their sexual intimacy with laughing emojis. (See Complainant's Texts, Exhibit 3).
   d. Reporting Party claims she, "saw the Respondent in class the next day, August 17, at 1:30 PM and 'flipped out.'" (See Investigation Report, p. 7,  6). Yet, the Reporting Party texted the Respondent and invited him to go to Target on that same day, August 17, at 2:37 PM . (See Complainant's Texts, Exhibit 3).
      i. **Reporting Party is posturing in an attempt mislead investigators and authorities.**

III. **Rules**

**Sexual Misconduct**
Policy Statement & Definitions:

All sexual activity between members of the CSU community must be based on Affirmative Consent. Engaging in any sexual activity without first obtaining Affirmative Consent to the specific activity is Sexual Misconduct, whether or not the conduct violates any civil or criminal law.

Sexual activity includes, but is not limited to, kissing, touching intimate body parts, fondling, intercourse, penetration of any body part, and oral sex. It also includes any unwelcome physical sexual acts, such as unwelcome sexual touching, Sexual Assault, Sexual Battery, Rape, and Dating Violence. Sexual Misconduct may include using physical force, violence, threat, or intimidation, ignoring the objections of the other person, causing the other person's intoxication or incapacitation through the use of drugs or alcohol, or taking advantage of the other person's incapacitation (including voluntary intoxication) to engage in sexual activity. Men as well as women can be victims of these forms of Sexual Misconduct.

Affirmative Consent means an informed, affirmative, conscious, voluntary, and mutual agreement to engage in sexual activity. It is the responsibility of each person involved in the sexual activity to ensure that Affirmative Consent has been obtained from the other participant(s) to engage in the sexual activity. Lack of protest or resistance does not

mean consent nor does silence mean consent. Affirmative Consent can be withdrawn or revoked. Affirmative Consent cannot be given by a person who is incapacitated.

A person with a medical or mental Disability may also lack the capacity to give consent. Sexual activity with a minor (under 18 years old) is never consensual because a minor is considered incapable of giving legal consent due to age.

**Sexual Assault- Rape:** Complainant alleges that Respondent **attempted to** penetrate the Complainant's vagina with both, first his fingers and then penis, without the Affirmative Consent of the Complainant and with the present ability and the intent to commit Rape.

**Rape** is the penetration, or attempted penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the Affirmative Consent of the Complainant. Rape also includes the attempted penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the Affirmative Consent of the Complainant, with the present ability and the intent to commit Rape.

**Sexual Assault-Fondling:** Complainant alleges that Respondent touched her private body parts, her vagina with his fingers and grinded his penis on Complainant's vagina without Complainant's Affirmative Consent for the purpose of sexual gratification.

**Fondling** is the touching of the private body parts of another person for the purpose of sexual gratification, without the Affirmative Consent of the victim, including instances where the Complainant is incapable of giving Affirmative Consent because of their age or because of their temporary or permanent mental incapacity

IV.  Analysis

The current charges of non-consensual sexual assault, fondling, and sexual misconduct against Camren should be dismissed because the allegations do not support a finding that he is responsible for nonconsensual sexual contact by a preponderance of the evidence. It is undisputable that the parties physically engaged in sexual intimacy. Yet, the Reporting Party is now retroactively stating she did not consent. Similarly, the Reporting Party's veracity is seriously called into question. Her own evidence submitted, in conjunction with her statements, demonstrates a discernable contradiction. The forthcoming analysis will explain why affirmative consent was given both verbally and physically at the time of their sexual intimacy.

The proceeding paragraphs will also highlight the Reporting Party's lack of veracity for the allegations at hand. The motivation of the Reporting Party is also demonstrated through statements and general demeanor. These allegations are remarkably serious and carry heavy consequences against a young man who has no history of sexual violence and now faces jeopardizing stigma of a sex offender, when that simply is disconnected from reality. In fact, the

Respondent has been ridiculed by classmates telling him he should be behind bars, nicknaming him the "first floor rapist." This has been humiliating and demoralizing to Camren Bagnall. In no way is this response intended to disparage the Reporting Party. However, a serious injustice is threatening the livelihood, career, and reputation of an outstanding and stellar young man.

### A. Camren Had Affirmative Consent At All Times, Throughout Their Sexual Intimacy.

Applying the aforementioned rule of consent, "Affirmative Consent means an informed, affirmative, conscious, voluntary, and mutual agreement to engage in sexual activity. It is the responsibility of each person involved in the sexual activity to ensure that Affirmative Consent has been obtained from the other participant(s) to engage in the sexual activity. Lack of protest or resistance does not mean consent nor does silence mean consent."

Camren and Lillian Gregg had engaged in a consensual sexual encounter. Throughout their physical engagement in the Reporting Party's room, there was always consent. It is wholly denied by Camren that he would force himself onto the Reporting Party against her will. The consent was provided affirmatively by the Reporting Party both verbally and physically. While it is denied by the Reporting Party that consent was given, her credibility should be called into question. The disputed statements provided up until this point have been meritless and unsubstantiated, including Respondent's alleged intoxication and Reporting Party's "fear" given her immediate contact with him via text message. Therefore, the notion that she was nonconsenting during their sexual intimacy likely a false statement.

The Reporting Party claims that Camren leaned in and kissed her "without her consent." the (See Investigation Report, p. 5,   7). Yet the Reporting Party would like omit the fact that she had been physically rubbing Camren's thigh around his penis area, giving the physical hint that she wanted to become intimate. Furthermore, the Respondent recalls the Reporting Party getting on top of him while he laid on his back. Never at any time during the kissing did the Reporting Party tell Respondent "stop" or "get off me" nor did she push him off and tell him to leave her room. By Reporting Party's own admission, she states, "he asked, 'do you want to do this?' and Gregg replied 'sure.'". Id. This could not be a more objective affirmation of consent. Therefore, Reporting Party's claim that she did not consent to kissing patently false.

The Reporting Party claims that she did not consent to fondling. However, as the parties progressed in their sexual intimacy, it was Gregg who began fondling Camren's penis and thrusting her hips on Camren as he laid on his back with her on top of him. (See Investigation Report, p. 10,   2). While this occurred, the parties undressed and Gregg stated she, "was as virgin and didn't want to have sex." (See Investigation Report, p. 10,   4). Camren stopped and began to put his shirt back on. It was at this point that the *Reporting Party* asked Camren if he knew what "griding" was. (Emphasis added). Id. Here, Gregg initiated the kissing and "grinded" on him. As this continued, Camren noted she became tense and asked her if she was okay, to which she responded, "yes I am getting sensitive". Id. at   5. When Camren began to rub his hands on the Reporting Party's vagina and penetrated her with one finger, he asked again, "are you good?" and followed up with "do you want to stop?" Id. These are important to note as it

clearly demonstrates Camren requesting consent to which Gregg affirmed. While the rule states, "silence is not consent," her own statements, in conjunction with continuing physicality with Camren, does not constitute a revocation of consent. At all times, Camren understood that sexual intercourse was not an option and he was specifically intending to avoid and penetration with his penis as Gregg was on top of him "grinding".

During oral sex of the Reporting Party, the Reporting Party was the one who took off her own underwear. Coincidentally, the Reporting Party would like to leave this fact out during the preliminary investigation report with Ms. Dhillon. However, the police report states, "Bagnall placed his head between the victim's legs and performed oral sex on her. The act went on for approximately five to ten minutes. At some point, victim kicked off her shorts to remove them." (See Police Report, p. 4,   7). Yet, Gregg states, "He took off my shorts," when asked by the Title IX investigator. (See Investigation Report, p. 6,   8). Examining this, Camren was not told, "no" or "stop" during these five to ten minutes. In fact, by Gregg kicking off her own underwear, it can only be presumed that she was consenting given her physical actions. Once again, Gregg has provided inconsistent answers. When Gregg would tell Camren she was sensitive, he stopped. Thus, he did not overpower, threaten, or coerce Reporting Party into these sexual acts, she willingly consented.

Notably, in the police report and the preliminary investigation report, the Reporting Party states she gave oral and affirmative consent when Camren asked if she would perform oral sex on him. (See Police Report, p. 17,   5) (See Investigation Report, p. 6,   9). Again, by her own admission, the Respondent **asked** if she would perform oral sex, and Reporting Party said, "sure." Despite her claim that "she wanted it to be over," her affirmative statement and continuation of sexual activity clearly indicated consent.

The Reporting Party claims her hair was pulled and face was pushed onto his penis, this is inherently false, and the Respondent adamantly denies this. The allegation is an attempt to portray Camren in a dishonest light. The finder of fact must look at the credibility of each party in this instance. The Reporting Party has provided inconsistent and contradictory statements. Camren acknowledged that he held Gregg's hair because it was in her face but denied any forceful pulling of her hair. Further, he denies pushing her face on his penis.

In conclusion, the allegations and the charges listed, all stem from affirmative consent. As stated above, the Respondent constantly checked in verbally with Reporting Party while she would reply verbally or physically; Respondent stopped if she told him she was getting sensitive; Respondent understood and clearly intended to avoid any vaginal penetration with his penis; Respondent asked if she would give him oral sex to which she replied, "sure." Finally, the Reporting Party would affirm consent by verbal acknowledgement or would physically acknowledge by continuing to touch his penis or take off her own clothes. Since the parties are the only two witnesses to the alleged incident, a determination of credibility must be considered and will be discussed next.

**B. Reporting Party's Text Messages Demonstrate A Consensual Sexual Encounter.**

The veracity behind the statements provided by Gregg needs to be called into question. Specifically, there are a few instances where the Reporting Party avails herself to Respondent after their sexual intimacy. One **major** issue that needs to be discussed is Gregg's actions after their sexual intimacy. The alleged incident occurred on August 16, 2020 between 10:00 PM and 11:30 PM. The Reporting Party sends a text message to Camren on August 16, 2020 at 11:42 PM, "Just so ya know. You gotta go much lighter it hurts to pee right now," with a laughing emoji image. (See Complainant Texts, Exhibit 3, p. 2). Examining this text message exchange between the parties and initiated by Gregg, it refutes any notion of alleged "fear". It is highly doubtful and unreasonable for a person who was just sexually assaulted to text their aggressor in a playful manner with laughing emojis and sending "lol." (Laughing out loud).

Upon further examination of this text correspondence, Camren states, "I'm so sorry," and "Your not mad right?" (See Complainant Texts, Exhibit 3, p. 2). To which she replies, "No I'm not mad lol. It's just really hard with me most of the time." Id. It is obvious that what transpired moments prior to these text messages was mutual. Furthermore, based on the texts, the Reporting Party is coaching the Respondent on what she likes and does not like when involved in sexual foreplay. The apologies expressed by Camren are clearly in reference to any vaginal pain he may have caused her from their consensual intimacy. Camren states, "Of course I don't want to hurt you," to which Gregg replies, "Ik (I know) you don't…). Id. A reasonable person could infer that Camren and Gregg's relations were consensual and were setting up a potential future sexual encounter. However, due to Camren's girlfriend in Connecticut, he began to feel guilty and wanted to distance himself from Gregg.

The following day, August 17, 2020, around 11:26 AM, Gregg once again initiates contact with Camren after this alleged abuse occurred, "Hey are you in ur room rn (right now)." Camren does not respond. Later that same day, Gregg initiates contact around 2:37 PM and asks Camren, "U want to come to target with Mia Max and Me?" Id. Camren responds, "I'm about to go for a run but thanks for the invite." Id. Interestingly, Gregg states, "She saw the Respondent in class the next day, August 17, 2020 at 1:30 PM, and 'flipped out' recognizing that she should be panicked at the sight of the Respondent." (See Investigation Report, p.7,   9).

Analyzing this, the Reporting Party is in clear contradiction with her own statements. She claims to have had a panic attack at the sight of Respondent, yet she continues to text him, **and** invites him to go take a trip to Target. Moreover, Gregg was asked, "Did you invite the Respondent to join your group for the Target trip?" Gregg replied, "No." (See Investigation Report, p. 8,   2). The text messages clearly depict Gregg asking Camren if he wanted to go. (See Complainant Texts, Exhibit 3). Once again, her veracity for the truth must be questioned which begs the question, is she being truthful in her allegations?

Overall, the text messages shown in Exhibit 3 reveal there was no sexual assault and discredits Gregg's honesty. A victim of sexual assault, having panic attacks, would reasonably avoid his/her assaulter. That did not happen here. Gregg reached out to Camren on her own volition. In turn, her claim that she did not consent to sexual intimacy is strongly refuted; she is simply unable to speak the truth. This matter rises and falls on the credibility of the parties, Gregg has major issues with her credibility.

### C. Gregg's Ulterior Motive For Pursuing This Title IX Complaint.

As stated previously, Camren had a relationship (on and off) with his girlfriend from high school who lived in Connecticut. This was confirmed through witnesses in the preliminary report, including Max Liss and Mia Rathsack. After Camren had engaged in sexual activity with Gregg, he was upset with his infidelity to his girlfriend. Camren decided to cut ties with Gregg and just move forward and avoid contact with her. This is also known as, "ghosting," which means you abruptly stop communicating with someone and avoid him/her.

Gregg began to probe Max Liss, Camren's friend, about whether or not Camren still talked to his girlfriend; and whether Camren would talk about Gregg to him. For example, "During the trip, the complainant had asked Liss questions related to the Respondent like, why had he declined to join them and whether the Respondent had a girlfriend." (See Investigation Report, p. 15,    4). Liss had also confirmed that Camren "felt horrible and he stopped communicating with Lily, which had frustrated her…" Id. Unfortunately, it is reasonable for a young girl or guy to be upset if their "crush" stops talking to them after engaging in sexual activity. However, it is wholly atrocious to accuse that person of sexual misconduct in retaliation for hurt feelings.

Furthermore, Gregg had put herself in a position where she now must double down on her allegations. Officer Madison Dack (hereinafter "Dack") provided testimony to the preliminary report and is a mandated reporter. Once Dack had told Reporting Party that she was obligated to report this if she continued to tell her, Gregg's mood shifted. In fact, it was observed and stated, "The Complainant had not been happy about finding out that Dack was a mandated reporter, but she had said 'sure' and continued with the conversation." (See Investigation Report, p. 12,    1). During Gregg's report to Dack, she initially omits the allegation that Camren was drunk or high, but then later adds it to her story. Once again posturing herself and disparaging the Respondent without substantiation.

Similarly, Dack's handwritten statement to the police on August 19, 2020, stated, "I informed Gregg that I am a mandated reporter and would have to report the incident. Lillian's eyes got really big after I stated this. She was already nervous-looking and responded, 'shit, okay'. (See Police Report, p. 35). Being closer in time to the night of the alleged incident, Dack's ability to recall her conversation with Gregg is recent. The actions and response of Gregg do not exhibit a person who just sexually assaulted.

In conclusion, the above paragraphs demonstrate Reporting Party's motive to pursuing this Title IX complaint against Respondent. Strangely enough, Gregg did not want to pursue criminal charges when at the police station giving her statement but wanted to pursue this action of Title IX.

### D. Miscellaneous Information In The Investigation Report.

The Title IX Investigative report includes irrelevant and inflammatory information that is highly prejudicial. Specifically, the report quotes witnesses stating Reporting Party was "raped". While we are not in a courtroom setting, the Respondent still has the right to be presumed

innocent. To use such conclusory terms in a preliminary report is prejudicial to the Respondent. This indirectly creates a burden on the accused to demonstrate his innocence, rather than the accuser to prove her case. A few witnesses, Rebecca Masliah, Vonne Ng-Bader, Emily Silva, Lachlan Davis and Emily Scheese all provide the Reporting Party's account without any substantiating facts. They were not present the night of the alleged incident, nor were they with the either party immediate before or after the sexual intimacy occurred. It is evident in the timeline that Gregg had told her friends that she was "raped" after she was "ghosted" by Camren.

Nothing mentioned in the preliminary report or the police report exhibits Camren displaying threatening or intimidating behavior. However, the Reporting Party claims that simply because he is taller than her, that she feared for her safety. This does not make sense. Gregg had seen him prior to the night in questioned and invited him to her room without any fear. Moreover, she continued to initiate conversations via text and invited him to Target the following day.

Additionally, there are statements within the police report that are not stated in the preliminary investigation report. For example, when asked questions for the preliminary investigation, she states Camren told her to rub herself during sex. (See Investigation Report, p. 7,  3). This is not included in the police statement handwritten by Gregg on August 18, 2020. (See Police Report, p. 19-20). One month later, the Reporting Party is interviewed for the preliminary hearing on September 25, 2020 with an additional follow up interviews on October 8, 2020 and November 10, 2020. (See Investigation Report, p. 4). In a futile attempt, Gregg reports that she was essentially, "faking enjoyment", which is certainly a troubling statement given the circumstances alleged. (See Investigation Report, p. 7,  4-5). Understandably, someone could be deceived into thinking the encounter was mutual. On the other hand, it is suggested that the Reporting Party's inconsistent statements are embellished to mislead the determiner of facts and those responsible for reporting this alleged incident. The police report is closer in time to the alleged incident. It is suggested that the Reporting Party has deliberately skewed her version to fit her narrative.

According to Exhibit 2 in the report, there is a statement by the Reporting Party that she is in possession of a rape kit test performed, "Yes, I have a rape Kit and photo evidence that the police currently have." (See Exhibit 2, page 3). It is signed on August 28, 2020 by the Reporting Party. However, no such kit or its details have been presented to Respondent. It also does not appear in the police report. On August 17, 2020, at or around 7:20 PM Dack offered a rape kit test at the hospital and safe room to Gregg. (See Police Report, p. 19). Gregg was "unsure about the rape kit" and felt the safe room was unnecessary. Id. Irrespective of this, it is acknowledged that Respondent had digitally penetrated Gregg, consensually, but it would go to her credibility if this statement provided on the complaint form were false to obtain a no contact order.

Thus, the little details are vital in showing that Gregg's allegations cannot be corroborated or substantiated. These details display contradicting and unreasonable actions by the Reporting Party. This has caused students at the school to humiliate and slander Camren Bagnall as the "First Floor Rapist." It is an absolute horrific stigma that no person can separate themselves from. Even more disheartening is the foundation of lies it is derived from.

### V.     Conclusion

Overall, a reasonable person can infer that three facts: 1) Consent was affirmatively given by the Reporting Party throughout their entire sexual intimacy; 2) The Responding Party was not forceful or aggressive in his physical engagement with the Reporting Party; 3) The actions of Reporting Party tell a much different story than what is alleged. The Reporting Party's veracity is seriously called into question given her inconsistent statements. It is undoubtedly a traumatic experience for both parties, but to allege that their sexual engagement was non-consensual is disconnected from reality. Simply put, this was a mutually consensual sexual encounter, and Lillian Gregg's feelings were hurt because of Camren's actions. Now, Reporting Party is alleging criminal acts of sexual misconduct without proper a foundation of facts to support her allegations.

Camren Bagnall has no history of sexual violence towards women, no prior criminal history, nor does he have any disciplinary issues with the school. He has an untarnished record that now must suffer the stigma of a sexual deviant. These heinous allegations are not in his character and would have witnesses to testify to that.

For the reasons set forth above, Camren Bagnall respectfully requests that the pending sexual misconduct charges be dismissed, preferably without the need for a hearing. Thank you for your consideration in this matter.

Sincerely,

/s/ Camren Bagnall
Camren Bagnall

/s/ Joseph D. Lento
Joseph D. Lento, Esquire

Cc:   Joseph D. Lento, Esquire
      Lento Law Firm
      1500 Walnut Street, Suite 500
      Philadelphia, PA 19102
      888-535-3686
      Joseph@JosephLento.com
      Licensed in PA, NJ, and NY